IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

MONICA LANE KENNEDY                                                    PLAINTIFF

V.                                              CIVIL ACTION NO. 3:24-CV-216 -DAS

COMMISSIONER OF SOCIAL SECURITY                                        DEFENDANT

**MEMORANDUM OPINION AND JUDGMENT**

The plaintiff appeals from an unfavorable final decision by the Commissioner of the Social Security Administration regarding her application for disability insurance benefits. The court finds the ALJ's decision that Kennedy was able to do light work is not supported by substantial evidence. Kennedy also argues that the jobs tendered by the vocational expert conflict with the RFC limitation restricting her to simple, routine work. The court affirms the decision on that point.

**Introduction**

Monica Kennedy, in her late forties by her date last insured (DLI), has a very long, significant and relevant history of chronic back problems, including multiple back surgeries and other treatments going back decades. Her pre-existing back problems resulted in an initial discectomy when she was just twenty-two, followed by another discectomy, a spinal fusion at L1/S5, and implantation of a spinal column stimulator to treat her spinal pain which proved ineffective. Kennedy's history also shows she underwent an exhaustive number of other treatments and procedures including multiple injections, several blocks, steroids, burning of nerves and multiple courses of physical therapy. Nevertheless, throughout this history, Kennedy

worked as a nurse from 2003 into 2015. When her pain worsened in 2014, she sought further treatment and left her employment in 2015.

Since 2014, through and past her date last insured, Kennedy has been continuously treated for her back pain and repeatedly diagnosed by more than one of her medical providers as suffering from failed back syndrome, an unfortunately common sequel to back surgery. It is characterized by severe chronic, frequently disabling pain that is difficult for physicians to treat and life altering for their patients.

During the relevant time, surgery was ruled out by all but one of Kennedy's specialists as an option for treatment, and other treatments were unavailing. She has been on pain medications throughout that time in what the ALJ described as an aggressive regimen. Multiple imaging studies by her treating providers from 2014 forward have shown multiple abnormalities throughout her lumbar spine and have demonstrated continuing deterioration of her spine during the relevant period. Kennedy testified to pain and physical limitations unquestionably inconsistent with the standing and walking at the light level assessed by the ALJ.

Despite both the preexisting back history and the continuation and worsening of her spinal conditions, the ALJ largely dismissed her subjective complaints as not supported by the objective medical records. Without ever mentioning the failed back syndrome diagnosis, and in the absence of any medical opinion addressing Kennedy's physical capacities, the ALJ found she could work consistent with a light RFC. Kennedy contends that substantial evidence does not support a finding that she can stand and/or walk for six hours of an eight-hour workday.

**Standard of Review**

This court's review of the Commissioner's decision is limited to determining whether there is substantial evidence to support the findings of the Commissioner, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and whether the correct legal standards were applied. 42 U.S.C. § 405 (g.); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Conflicts in the evidence are for the Commissioner to decide, and if substantial evidence is found to support the decision, the decision must be affirmed even if there is evidence on the other side. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner, *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988).

The court must however, despite its limited role, "scrutinize the record in its entirety to determine the reasonableness of the decision ... and whether substantial evidence exists to support it." *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992). In assessing the administrative evidence, the court looks to all evidence in the record. There is a notable difference between "substantial evidence" and "substantial evidence on the record as a whole." *Jackson v. Hartford Acc. and Indem. Co.,* 422 F. 2d 1272, 1277 (8th Cir. 1970). Looking to see if there is "substantial evidence on the record as a whole" involves more scrutiny because "[*t]he substantiality of evidence must take into account whatever evidence in the record fairly detracts from its weight.*" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (emphasis added). If, however, the Commissioner's decision is supported by the evidence, then it is a conclusive and must be upheld. *Perales*, 402 U.S. at 390.

**ANALYSIS-RFC ASSESSMENT**

**Medical and Work History**

Kennedy's records show a history of multiple surgeries, including the spinal fusion and spinal stimulator placement surgery and other treatments before her date of onset. She also had two pre-onset pregnancies which she reported exacerbated her pain, the second one causing more problems than the first. Apparently, many of the other procedures shown in her history also preceded her date of onset. Despite these preexisting chronic back problems, Kennedy continued to work as a nurse, classified as medium work, though Kennedy testified her job included some heavy lifting in patient care and transfers.

The court does not hesitate to find that this pre-onset history is relevant to the assessment of whether substantial evidence supports the ALJ's physical capacities assessment. Kennedy's history shows significant back problems that would not be likely to resolve and would be likely to worsen over time. Her medical history before her date of onset essentially establishes a baseline of problems and chronic pain that had not yet disabled Kennedy most likely because of her youth.

Both records predating the date of onset and postdating the date last insured may be relevant to the evaluation of a disability claim. The question is whether a history of preexisting problems or the evaluation just after her date last insured are factually relevant to the plaintiff's condition during the application period. For that reason, Social Security regulations have long required the consideration of medical opinions in the records even though they predate onset. *Davidson v. Colvin,* 164 F. Supp. 3d 926 (N. D. Tex. 2015) (Though the plaintiff claimed disability starting in 2011, the ALJ erred in failing to address opinions by treating physicians

4

given in 2009 and 2010, stating she would not be able to sustain employment because of recurrent hepatitis C). [1]

While the administrative records do not include this long extensive period of surgeries and other treatment predating onset, this history was recorded and relied on by treating physicians during the relevant time period and confirmed in part by scans documenting the two most serious pre onset surgeries — the spinal fusion and the implantation of the spinal column stimulator. Given the nature of back injuries and the evidence that Kennedy's back problems continued to worsen throughout her history into the relevant time and up to her date last insured, these pre-existing back conditions are factually relevant to the pending claim.

Kennedy began having more severe pain problems in 2014 motivating her first to switch from hospital work to hospice work, hoping the change would enable her to continue working. During 2014, Kennedy had several ER visits and was seen by a neurosurgeon. An April 2014 examination found normal range of motion and strength, but she had pain at forty-five degrees on her straight leg raising test. Two weeks later, a CT imaging found an annular bulge at L-4, above the site of her earlier fusion with mild dextroscoliosis and noted post-operative changes. Kennedy found the job change and treatment she received in 2014 and 2015 was not enough, and she left her job in 2015, though she did not apply for disability benefits at that time.

---

[1] *Carpenter v. Astrue,* 537 F. 3d 1264, 1266 (10th Cir. 2008) (ALJ erred in failing to consider claimant's multiple back and neck problems beginning when she was two years old and continuing into adulthood); Contrast, *Cauthen v. Commissioner of Social Security*, 415 F. Supp. 3d 738 (N.D. Miss. 2019) aff'd sub nom *Cauthen v. Saul*, 827 Fed App'x 444 (5th Cir. 2020)(Medical records predating onset were not related to whether she was disabled during the relevant period) ; *Johnson v. Bowen*, 864 F. 2d 340, 345 (5th Cir. 1988) (Opinion about claimant's mental condition was not relevant where it related to a time in 1982 and 1983 when he had stopped working, but was able to return to work in 1983 and to continue working for another two years,)

In 2015 and later, different imaging — x-rays, cat scans and MRIs -- were done, and every one of the images over the relevant time included abnormal findings. These scans showed Kennedy's spinal conditions worsened during the relevant period. CT scans and X-rays taken July 7, 2015, in connection with her treatment at Semmes Murphey Orthopedic Clinic showed intact surgical hardware with loss of disc height at L-3 and L-4 levels, which was described as a vacuum phenomenon with possible junctional failure and an incomplete fusion. A CT showed mild to moderate degenerative changes without spinal canal stenosis or high grade bony foraminal stenosis. These findings led to discussion of possible surgical intervention to extend the earlier fusion to L4-5 and L3-4. Another July 2015 CT showed increasing loss of intervertebral discs space at L4-L5 with vacuum disc phenomenon and worsening L4/L5 foraminal narrowing as compared to a study just a year earlier. The images showed deformities on the ventral sac at L2/L3 and L3/L4 with mild to moderate compression at L4-L5 and possible decrease contrast filling at the L5 dural root sleeve.

While as the ALJ noted Kennedy was able to walk without difficulty at that time, she had L5 radiculopathy with positive straight leg raise test and her proximal motor strength in that extremity was slightly diminished. On August 5, 2015, a doctor's examination noted numbness in her right thigh, diminished strength in the right leg, with limited range of motion. She had tenderness over the greater trochanter and iliac crest with "severe pain" radiating into the right leg. Based on these findings the doctor recommended a sacroiliac joint injection. Kennedy underwent the procedure but did not get pain relief.

Additional imaging in April of 2016 showed evidence of a mild broad based disc protrusion, causing slight thecal sac effacement and moderate bilateral facet hypertrophy, worse

6

on the right, with osteoarthritic change at the L4 disc level. There was another disc protrusion at L3, causing effacement of this thecal sac with slight caudal encroachment on the right foramen.

The specialists ultimately decided that there was no surgical option to help her. There were consistent reports of radicular pain down her right leg with one provider noting that the pain matched the dermatome. The complaints of radicular pain in the right leg are consistent throughout the records with intermittent radicular pain on the left side.

While Kennedy was continuously treated monthly for her pain throughout the period of her application after surgery was ruled out, there were no further scans until just after the date last insured. In May 2019, the claimant fell in her kitchen and further exacerbated symptoms. At that time, flexion, extension, activity, sitting, standing, and lying down were all noted to exacerbate the pain, which was characterized as an 8/10. She was also diagnosed with and treated for neuropathy in her feet in 2015, which progressed to a shuffling gait and intermittent trouble walking by 2018. In a May 2021 examination, just after the DLI, Kennedy's neuropathy had progressed to numbness in both feet. An MRI at that time found problems at almost every level in the lumbar spine.

Her medical records after the onset date include multiple findings by different medical providers that Kennedy was suffering from failed back syndrome, also called post-laminectomy syndrome. The ALJ never mentioned this diagnosis in his decision. The ALJ briefly mentions the May 2021 evaluation just a few months after her DLI, noting it shows continuing back pain, new unrelated symptoms, and the fact that an MRI was done on her back. Given the short time between the DLI and this visit and the absence of any reported trauma later than 2019, these findings are likely the last and best indicator of her physical condition at and before her DLI. This MRI showed disc degeneration and spondylosis *throughout* her lumbar spine and foraminal

7

stenosis on the right at L4/5 and bilaterally at L3/4, indicative of continuing deterioration that was likely present before the DLI. *Davidson,* 164 F Supp. 3d at 941.

Despite this record, the ALJ found that her reported pain level and limitations were not supported by the objective medical and other evidence. He noted that the gait problems only developed later during the relevant period and that no assistive device for walking was prescribed for her before concluding that Kennedy could perform light work, specifically that she could stand and walk for six hours in an eight-hour day.

### **Evaluation of the Objective Records and the Extent of Pain**

In this case the ALJ found that the plaintiff's subjective complaints were not fully supported by the objective medical and other evidence. Given the plaintiff's description of her pain and limitations and despite the ALJ admitting that she was frequently "uncomfortable," he clearly determined Kennedy could perform light work on a sustained basis only rejecting her subjective complaints. Therefore, the question as to whether substantial evidence supports the ALJ's decision largely hinges on his evaluation of the plaintiff's pain, an unavoidably subjective symptom.

The reality of human pain and the severe suffering it can bring has eluded medical science's knowledge, skills and tool set. Medical science cannot directly test for the presence of pain nor measure its severity. Therefore, the exact extent and impact of pain can never be fully established by or completely corroborated by objective medical evidence. *Bunnell v. Sullivan,* 947 F.2d 341, 347 (9th Cir. 1991). But Social Security law acknowledges that pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings. *Gallagher v. Schweiker,* 697 F.2d 82, 84 (2d Cir.1983). "Once such an impairment has been diagnosed, pain caused by the

8

impairment may be found to be disabling even though the impairment 'ordinarily does not cause severe, disabling pain.' " *Id.* at 84. (quoting *Marcus v. Califano,* 615 F.2d 23, 28 (2d Cir.1979); *Foote v. Chater,* 67 F.3d 1553, 1561 (11th Cir.1995)); *Johnson v. Barnhart,* 449 F.3d 804, 806 (7th Cir. 2006); *Bentley v. Shalala,* 52 F.3d 784, 786 (8th Cir.1995).

### Social Security Ruling 16-3P

The ALJ's analysis of a claimant's pain is guided by Social Security Ruling 16-3P, 2017 WL 5180304 (2017). Under this ruling the ALJ must consider all symptoms including pain, "and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id*. at *2. This process first considers "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Secondly, once such an underlying physical or mental impairment or impairments are established, the task then shifts to evaluating the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* at *3. Factors to be considered in making this assessment include daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for fifteen to twenty minutes every hour, or sleeping on a board). SSR 16-3p at *7-8. A catchall provision allows for consideration of any other factors concerning or related to functional limitations and restrictions based on pain.

9

### Kennedy's Description of Pain and Limits

Kennedy testified to her pain and the resulting physical limitations. She said she is in constant pain, though the intensity waxes and wanes. The pain starts below her waist and extends down her right thigh. She cannot bend over or stoop and can only lift about five to seven pounds. Kennedy estimated that she could stand without significant pain for five to ten minutes. She lies down four to five times per day for thirty minutes to forty-five minutes at a time because of the pain. She spends most of the day in bed or in a recliner with a pillow under her knees because it helps to take pressure off her back. She is very restricted in her ability to perform activities of daily living and household chores such as cleaning. If what the plaintiff says is accurate, the limits preclude light work and likely all work.

### Seeking Treatment

Another factor to be considered in evaluating the intensity and persistence of pain symptoms is the extent to which an individual has attempted to seek medical treatment for symptoms and been compliant with treatment once it is prescribed. *Id. at \*8*. When a claimant is persistent in seeking relief of symptoms, such as trying a variety of treatments, being referred to specialists or changing treatment sources, it is an indication of the intensity of distress caused by the symptoms. *Id*. Another pertinent question is whether the frequency of treatment is consistent with the claimant's subjective complaints. When a patient refuses treatment or is non-compliant in the absence of reasonable reasons, the refusal suggests lesser pain. To the contrary, the degree to which a claimant accepts treatments and complies with prescribed treatments, the greater the inference that the pain symptoms are supported by the records. *Id. at \*9*.

The administrative record shows Kennedy was continuously under medical care throughout the relevant time for her pain issues. She was also a compliant patient. She was seen

10

by multiple specialists and underwent the sacroiliac injection seeking pain relief though that also failed. Furthermore, when one specialist suggested surgery, Kennedy agreed though the surgeon's personal health issues ended that possibility. Other specialists did not think there were any surgical options that would benefit Kennedy. Considering this factor, the record corroborates the pain complaints.

In each of the factors under this SSR, the objective evidence strongly favors and corroborates Kennedy's subjective complaints. There are no formal opinions on her physical functional capacity in the record, but the histories of surgeries undergone, the procedures undertaken, and medication prescribed, coupled with the multiple abnormal findings on multiple scans are all evidence providing the implicit opinion of a sequence of doctors and other providers corroborating Kennedy's subjective pain testimony. Doctors are not likely to order surgeries, strong medications or other procedures, except where the clinical evidence convinces them the subjective pain complaints are real. These implicit opinions and records of that treatment by multiple providers over years of treatment demonstrate that Kennedy's pain complaints were credited by her providers.

Nor is any patient likely to undergo so many surgeries and other procedures, including a spinal fusion and insertion of a spinal stimulator just to create the impression of experiencing pain. Kennedy's willingness to undergo all these treatments lends credence to her argument that her pain would preclude the standing and walking required to perform light work.

**Pain Medications**

The administrative record shows that beginning at least in 2014, multiple providers prescribed strong medications for Kennedy's pain. Kennedy said the pain medications caused side effects and that she still was in debilitating pain — enough pain apparently that, despite

11

reports of severe financial distress to her family from the loss of her income, she has never returned to work.[2] The ALJ describes the pain treatment as aggressive, and the record bears out this description. Among medications she has received regularly were Norco, Lortab, Neurontin, Fentanyl patches, Ibuprofen, Trazodone for muscle spasms, Tramadol, and corticosteroids. More than once, despite strong maintenance medications, Kennedy received injections of pain medications at hospital emergency rooms.

What is not included in Kennedy's extensive records regarding her use of pain medications is also significant objective evidence corroborating her pain complaints. None of Kennedy's providers' records suggest exaggeration of symptoms, much less malingering, nor is there any suggestion in the voluminous records of any suspicion of drug-seeking behavior. To the contrary, Kennedy sought help from pain management specialists because she wanted to get off the pain medications. This long, ongoing course of treatment indicates that her providers credited her reports of truly severe pain.

The ALJ notes in his decision that one doctor at an ER visit in 2015, described her paraspinal pain as being mild. Those same records, however, show Kennedy was already on Lortab and Neurontin before this visit. A nurse on that visit noted: "Alteration in comfort: actual related to back pain." And despite his "mild" description of her pain, the ER doctor ordered shots of Dilaudid and Decadron for Kennedy.

The extensive pain medications prescribed provides evidence related to the seriousness of the pain suffered. This evidence indicates a level of pain severity beyond the ALJ's concession that Kennedy was "frequently uncomfortable." In a similar case where a claimant was treated with a spinal cord stimulator, in addition to Toradol, Demerol, Vicodin and morphine, the court

---

[2] In at least one visit, Kennedy shared with her mental health counselor that she was concerned that her family was on the verge of being evicted.

12

found that the prescriptions supported the claimant's claim of disabling pain.[3] *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).[4]

**Work History**

While Kennedy is relatively young and does not have thirty or more years of work history, given the early advent of back trouble, including a spinal fusion and the implantation of a spinal stimulator, managing to work as a nurse for a decade is an example of a good work history.[5] Kennedy clearly was willing to work under less than ideal circumstances and with pain throughout her career. She is due credit when she arrives at the point where she says she can no longer work. *Rivera v. Schweiker,* 717 F. 2d 719, 725 (2nd Cir. 1983) (The claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability).[6]

A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of disability. *Singletary v. Secretary of Health, Education and Welfare,* 623 F.2d 217, 219 (2d Cir.1980). In *Singletary,* the court noted, "Mr. Singletary does show a life history of hard labor performed under demanding conditions over long hours. His work record shows employment by nationally known racing stables. These animals, both trotters and pacers, are very valuable. Their care is not entrusted to malingerers or goldbricks. His prior

---

[3] Kennedy was not prescribed morphine becasue she was allergic to it.
[4] The court in Carradine also found the ALJ erred in discounting her pain complaints as inconsistent with her walking up to two miles. Her doctors prescribed exercise for her back pain. Because Carradine did not claim to be paralyzed, the court did not see how her walking was inconsistent with her suffering severe pain.

[5] Kennedy's medical records note additional medical history of three knee surgeries and two facial construction surgeries at an early age. She nevertheless obtained a bachelor's degree in one field before obtaining her nursing degree, before beginning her career. These facts show a desire to work that corroborates her claim that she no longer can.
[6] While the language of the regulations since 2018 has shifted from a focus on the claimant's credibility to a focus on the extent that their subjective symptoms are supported by the records, the importance of work history is still valid. It is now other objective evidence that supports the subjective complaints.

work history justifies the inference that when he stopped working, he did so for the reasons testified to." Substituting the care of fellow human beings for the reference to horses, the above quote equally applies to Kennedy and her work history.

### ALJ's Assessment

Despite all the procedures and treatments in her very long history of back problems, the ALJ found the objective medical records did not support Kennedy's testimony of debilitating pain and functional limitation. The ALJ significantly never mentions the diagnosis of failed back syndrome, a significant omission. "Failed back surgery syndrome (FBSS) is defined by the International Association for the Study of Pain as lumbar spinal pain of unknown origin either persisting despite surgical intervention or appearing after surgical intervention for spinal pain originally in the same topographical location."[7] The pain may originate after surgery, or the surgery may exacerbate or insufficiently ameliorate existing pain. It can have debilitating effect on patients and is relatively prevalent among those who have received back surgery. *Id.* The diagnosis itself necessarily includes the opinion of the diagnosing doctor that the patient is suffering significant pain. While a claimant is not considered disabled just because work activities cause some pain to them, a diagnosis of failed back syndrome indicates a medical judgment that the condition is likely to cause significant pain likely inconsistent with a sufferer meeting the walking and standing requirements for light work. *Id.* Research on this syndrome has also shown that patients with failed back syndrome, when compared to patients with other chronic pain syndromes, including rheumatoid arthritis, osteoarthritis, and fibromyalgia, show lower quality of life score, greater pain, unemployment, opioid use, and disability. *Id.* Given the

---

[7] Vwaire J. Orhurhu; Robert Chu; Jatinder Gill, *Failed Back Surgery Syndrome,* National Library of Medicine, National Center for Biotechnology Information, National Institutes of Health. May 1, 2023

significance of the diagnosis which corroborates Kennedy's claimed pain, the ALJ has erred in omitting and failing to consider this diagnosis in his pain analysis and assessing the RFC. Because this omission is potentially out-come determinative, it is prejudicial.

Instead, the ALJ emphasized findings of normal range of motion and strength that were largely, though not exclusively, in the earlier records. He found only that Kennedy had severe degenerative disc disease and anxiety and a depressive disorder. Kennedy's strength declined during the application period, and she had positive straight leg raising tests on examination from the earliest parts of the records along with consistent complaints of pain and radiculopathy. Looking at the records the court finds that the objective evidence in the records overwhelmingly corroborates Kennedy's testimony. Though there is some evidence to the contrary, it is not substantial evidence on the record as a whole. Short of medicine finding a way to measure and quantify the degree of pain, it is hard to imagine what further objective proof of severe pain could be expected or provided for Kennedy.

### Lack of Supporting Medical Opinion

Finally, because the only opinion in the record that Kennedy can stand and walk for six hours in a normal eight-hour workday belongs to the administrative law judge, the court finds that the RFC and therefore the entire decision is not supported by substantial evidence. This record lacks any medical source statement addressing any aspect of Kennedy's remaining physical capacity.

The court acknowledges that the ALJ is solely "responsible for determining an applicant's residual functional capacity." *Ripley v. Chater,* 67 F.3d 552, 557 (5th Cir. 1995)(citing 20 C.F.R. § 404.1546). It is not a medical opinion, but an administrative decision, and the ALJ has considerable discretion in considering not just the medical evidence in the

15

record, but other evidence. *Perez v. Secretary of Health and Human Services*, 958 F.2d 445, 446 (1st Cir. 1991) (citations omitted).

Additionally the Fifth Circuit Court of Appeals has held the absence of a supporting medical opinion alone does not invariably render an administrative record incomplete, but rather the court must look at whether substantial evidence exists to support the decision. *Ripley*, 67 F.3d at 557. However, because ALJs lack the necessary expertise to correlate medical conditions to functional limitations, "[u]sually the ALJ should request a medical source statement describing the types of work that the applicant is still capable of performing." *Id.*

In *Ripley*, the Fifth Circuit remanded the case of an applicant with back problems and a four-year history of surgery, because there was no medical opinion to "clearly establish ... the effect Ripley's condition had on his ability to work." Substantial evidence did not support the ALJ's RFC determination because the court could not determine the effect the claimant's conditions, "no matter how 'small,'" had on his ability to work, absent a report from a qualified medical expert. *Id.* at 558 n.27.

In *Williams v. Astrue,* 355 F. App'x 828 (5th Cir. 2009) the Fifth Circuit re-affirmed its decision in *Ripley*, explaining "that an ALJ may not — without opinions from medical experts — derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions." *Id.* at 832, n.6. The "ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Id.*

The pertinent question is when the ALJ may make an RFC determination without expert medical opinions in the administrative record. The answer is that it is a rare case, and likely one clearly without merit, where the ALJ may determine the RFC in the absence of medical opinion. One such case is *Gutierrez v. Barnhart*, 2005 WL 1994289 (N.D. Tex. Aug, 9, 2009). But this case bears no similarity to the instant case. The DDS physicians rated Gutierrez as able to

16

perform sedentary work, but the ALJ found she could perform light work. The DDS doctors' hand-written notes questioned her credibility because of gross disparities in findings and symptoms between two examinations in the same year without an intervening trauma to explain those disparities. The ALJ's decision compiled a long list of reasons why he found Gutierrez was not credible.[8] Gutierrez also testified that her past jobs as a keno runner and laundry ticketer were not difficult despite her medical conditions. Because these jobs were within the assessed RFC, her testimony supported the ALJ's RFC determination.

More typically, in the absence of supporting medical opinions, decisions are reversed. In *Howell v. Berryhill,* 2017 WL 2414734 at *4 (N.D. Miss. June 2, 2017), the decision was reversed because the ALJ assessed the RFC without an updated medical opinion after a single MRI indicated the plaintiff's back condition had worsened. In *Connie C. v. Berryhill,* 2019 WL 2516727 (N.D. Tex. May 5, 2019), the decision was not supported by substantial evidence because there were no medical opinions about the impact of the plaintiff's mental conditions on her ability to work.

In *Whalen v. Kijakazi,* 2022 WL 3333487 (N.D. Miss. Aug. 11, 2022), this court found the ALJ's decision was not supported by substantial evidence because the RFC was based only on raw medical evidence. Whalen had suffered bilateral rotator cuff tears that were surgically repaired, bilateral osteoarthritis in his knees and suffered meniscal tears in both knees which required surgical repair. The ALJ had improperly dismissed the findings of the pain treatment specialists as based on subjective complaints because the record included consistent complaints of joint pain, coupled with objective signs of bilateral straight leg raising tests and limited range

---

[8] She had no medical impairment to explain many of her complaints, including her claimed global weakness. She claimed she needed crutches , but none were ever prescribed, and she appeared at the hearing without them. She reported weight loss while her medical records showed she had gained weight, and she had refused further surgery to correct her back problems.

of motion in the lower extremities. *See also, Raper v. Colvin*, 262 F.Supp.3d 415 (N.D. Tex. 2017) (compiling cases finding an ALJ may not independently craft an RFC based on a claimant's medical conditions).

This ALJ recognized that the records show Kennedy has significant restrictions and admits she has some pain. He determined that she could not return to her past employment, but he decided based on the raw medical records without any expert assistance that she could perform light work. Given the decades long history of chronic, severe back pain and the medical records before him documenting increasingly abnormal scan findings at multiple levels in her spine, the ALJ erred in assessing Kennedy's residual functional capacity without any expert opinion. He lacked the expertise to differentiate between whether she could work at the light level of exertion; at the sedentary level; or if she was restricted to less than sedentary work. Finding the residual functional capacity determination was not supported by substantial evidence, the Commissioner's decision is reversed, and the case remanded for further proceedings.

## **Vocational Expert Conflict**

Kennedy also contends the ALJ erred in relying on the VE's listing of available jobs because the requirements for those jobs were not within her RFC. The ALJ found Kennedy could understand, remember and carry out instructions, but was limited to making and performing simple, routine, repetitive tasks; and making simple work-related decisions. In assessing the availability of other jobs, relying upon the testimony of the VE, the ALJ found that the plaintiff would be able to work as a mail clerk, as a storage rental clerk, and as a marker. All three jobs are light, unskilled work. The mail clerk and storage facility rental clerk jobs both require Level 3 reasoning. The marker job requires only Level 2 reasoning. Level 2 reasoning

requires the ability to apply common-sense understanding to carry out detailed but uninvolved written or oral instructions, while Level 3 reasoning requires the ability to apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form, and deal with problems involving several concrete variables in or from standardized situations.

The plaintiff argues that Level 3 reasoning is inconsistent with her RFC and therefore she cannot perform the storage facility or mail clerk jobs. She argues that the Level 2 reasoning is also inconsistent with her residual functional capacity, or alternatively that the VE, having selected two job titles that are not within her RFC, has so undermined the expert testimony, that remand is required.

The court has previously considered the question of whether Level 2 and Level 3 reasoning levels are inconsistent with a restriction to the performance of simple, routine, repetitive tasks. Ample authority supports finding that there is no such conflict. A limitation to simple, repetitive, and routine tasks "can support work with a reasoning level of two or three." *Smith v. Colvin*, 2014 WL 1407437, at *6 (N.D. Tex. Mar. 24, 2014), *report and recommendation* adopted, 2014 WL 1407440 (N D. Tex. April 1, 2014); *Melton v. Astrue,* 2012 WL 1004786, at * 2–3 (N.D.Miss. Mar. 26, 2012) (no conflict in VE testimony that plaintiff, who was limited to "simple, routine, repetitive tasks involving simple work related decisions," could perform work with a reasoning level of two); *Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir. 2005) (noting that level two reasoning appears consistent with a limitation to simple, routine, repetitive work); *Johnson v. Astrue,* 2012 WL 5472418, at *11 (E.D. LA. Oct. 5, 2012*), recommendation approved*, 2012 WL 5472303 (E.D. La. Nov. 9, 2012) (collecting cases and determining that plaintiff, limited to "simple, repetitive and routine tasks" could perform work with a reasoning level of three).

19

Therefore, the court finds no error as to this second issue.

**IT IS, THEREFORE, ORDERED,** for the reasons above stated, that the decision of the Commissioner is reversed and remanded for further consideration.

**SO ORDERED AND ADJUDGED** this the 1st day of May, 2025.

/s/ David A. Sanders  
**U.S. MAGISTRATE JUDGE**